## DeLancy Stoughton *v.* Danforth Mott.

*Public Officer. Trespass. Trespasser ab initio. Pleading.*

Where the plaintiff made a special replication to defendant's plea, alledging in substance, an abuse of the authority by which defendant acted : and a conversion of the vessel by defendant to his own use; *it was held,* that the replication was good; but that the plaintiff cannot rely upon any fact, alledged or admitted in the defendant's pleas, to make out the abuse of authority alledged in his replication, as that must be determined by the evidence introduced for that purpose.

Public officers cannot be made tresspassers *ab initio,* unless by proof of some positive wrongful act, giving character to the original act, incompatible with the exercise of the legal right to do the first act.

And where the plaintiff's vessel was seized under an act of Congress, for having contraband freight on board, and the defendant did not make the seizure but the seizure was made by an United States officer, and the defendant, though a deputy collector, assisted in unlading the vessel, but did not have charge of the same, the vessel being in charge of certain soldiers under the said officer, and while so in charge, a severe gale arising, the vessel became a wreck; under these facts, *it was held,* that the proof of defendant's agency in the detention or negligence in care of the same, was wholly insufficient to prove the defendant a tresspasser.

THIS was an action of trespass, to recover the value of plaintiff's sloop, wrecked in a gale on Lake Champlain under the follow ing circumstances. As long ago as about 1838, there was an insurrection of the French and some other portions of the inhabitants of the Canadas. The United States Congress, passed an act entitled the Neutrality Law, by which our citizens were prohibited from aiding, or in any way giving countenance or support to the insurgents, and declaring forfeited, all arms and munitions of war about to be transported from the territories of the United States into the Canadas, and the vessels in which the same were transported, if done in violation of the statute.

In the present case the defendant justified the seizure of the munitions of war, as forfeited under the act of Congress, and the detaining the vessel, for the purpose of unlading the munitions of war merely.

The plaintiff replied, that defendant had detained the vessel thence hitherto, *and converted the same to his own use,* and this was traversed, and tried by the jury.

The proof was, substantially, that while a battle was raging, between the insurgents and the British troops, within hearing of Rouse's Point, at which was an American garrison under the command of Capt. Dimmick, of the United States' army, the plaintiff's vessel, under the command of his brother, and with his privity, touched and cast anchor at the Point, laden with arms and munitions of war, designed, and on their way to aid the insurgents. The act of Congress made this contraband property, liable to seizure by any collector of the customs, and by any person, by direction of the President of the United States. At this place, there was a deputy collector of the customs, by the name of Crook, in the district of Champlain, New York, in which the property was; and the defendant was a deputy collector in Vermont, on the opposite side of the lake. The defendant and Crook, were requested by Capt. Dimmick, to examine the suspected vessel, which they did, and reported the contraband freight to Capt. Dimmick. He requested the defendant, to make the seizure, which he declined doing. Dimmick then directed some one, with a sufficient force of the soldiery, to make seizure of the vessel, and bring her to land, which they did, and unloaded the arms and munitions of war, upon the wharf. The captain of the boat then demanded her, but Capt.

Dimmick refused to surrender, and told the captain he could see to fastening the boat if he chose ; which he declined doing. She was then left in charge of the soldiers, and there arising a severe gale, the vessel became a wreck in the course of the next night. The jury returned a verdict for plaintiff, and the defendant brought the case up on exceptions. The opinion of the court sufficiently discloses the defendant's connection with the transaction.

*A. Underwood* and *C. Adams* for defendant.

*O. Stevens* for plaintiff.

The case was argued at the January Term, 1853, of the Supreme Court, in Grand Isle County, and held under advisement until the present Circuit Term, when the opinion of the court was delivered by

REDFIELD, CH. J. The first report of this case is found in 13 Vt. 175, and decides, first, " the liability of the vessel to be seized," and that it may be detained ten days without warrant; but if detained longer, the detention becomes unlawful, and the party may seek redress for such wrong in the State courts. But it says expressly, " Whether the remedy should be sought by trespass, or trover, is a question relating to the form of action, but cannot affect the jurisdiction of the State Courts ;" (which was the only question then before the court,) and therefore the propriety of the form of action was purposely left undecided. This case is next reported, in 15 Vt. 162. It is there decided that the frontier is a belt of country adjacent to the actual boundary ; which really seems very unimportant, as the form of expression in the act of Congress, is, "about to pass the frontier of the United States, for any place within any foreign State or colony conterminous with the United States ;" which could not, in fact, be true to the letter, unless the design were to pass the utmost limit of the frontier, be it of more or less width. But the important point of this decision here is, that the vessel is liable to seizure without reference to the actual purpose of passing the frontier, within the foreign country, provided the officers "had " probable cause to believe, and did believe, either from the charac- " ter of the vessel, or the quantity of arms and munitions on board, " or other circumstances, that either the vessel, or the munitions of

" war, either by the owner thereof, or any other person with his " privity, were to be used in carrying on any military expedition " or operations within the territory of a foreign power." This declaration of the opinion of this court, of the law of this case, coming from one of its most distinguished ornaments, who had had peculiar experience and knowledge on this and kindred subjects, and which was assented to at the time, by a majority of the present members of the court, it would not be expected, would now be received with any degree of hesitancy. And it is undoubtedly decisive, to a considerable extent, of the general merits of this case, upon any fair view of it, if the testimony detailed, is all of the testimony in the case, so far at least, as this defendant is concerned; unless, indeed, he can be made liable for the act of Dimmick, or those who acted under him and Crook, in not giving up the boat immediately upon her being unladen of her contraband burden, or else in not mooring her, with sufficient firmness, to enable her to ride out the gale, which absolutely demolished her, during the first night after the seizure.

And so, it would seem, have the plaintiff's counsel regarded the law of the case, since the decision in 15th Vol., judging from their pleadings, and the course of the trial spread out at length on the present bill of exceptions. And the pleas, meet fully enough, the actual agency of the defendant with the transaction, except, as to the purpose of the taking possession of the sloop, which it seems to us was disproved, by all, or most of the testimony upon both sides. And if the plaintiff, had specially traversed the pleas in the form they were pleaded, the proof of the pleas, in the form of the issue, must have failed. But the point of such a special traverse, that is, the purpose of the seizure, and the time of the detention, under the circumstances of this case, and the form of the action, it will be shown hereafter, must have amounted to an immaterial issue, which the plaintiff did well, not to join.

But the plaintiff, instead of demurring to defendants plea as immaterial, which perhaps he could not safely do, as enough is alledged to constitute a *prima facie* defence, with other immaterial matters, which, upon a traverse, certainly a special traverse, might have made it impossible, for defendant to establish the issue. to the full extent in which it was taken, made a special replication, alledging, in substance, an abuse of the authority by which defendant acted,

and a conversion of the vessel by defendant, to his own use. At the argument, we were somewhat inclined to think this replication, in the form in which it was drawn, tendered an immaterial issue, and amounted to a departure. But upon further consideration of the subject, and a critical examination of the cases referred to in the arguments, which are named in *The Six Carpenter's case,* 8 Co. 146 (a,) and in the English and American notes to this case, in 1 Smith's Leading Cases 188 (62,) we are now satisfied, that the form of the replication is good. The replication contains the allegation, of a positive conversion of the property to his own use by the defendant, which according to all the authorities, makes him a trespasser *ab initio.* So that, so far as the form of the plaintiff's replication is concerned, it seems to us to be altogether according to the most approved precedents, and sufficiently suited to the purpose of raising the questions intended to be raised, in regard to defendant's liability. Buller's N. P. 81; *Sir Ralph Bovey's case,* (1 Ventris 217;) *Gargrave* v. *Smith,* (1 Salk. R. 221;) *Dye* v. *Leatherdale,* (3 Wilson 20)—where the precise point is adjudged; as also in the case from Salkeld. And perhaps twenty more cases might be cited, where this form of pleading is sanctioned, when the plaintiff relies upon some act of defendant making *him* a trespasser *ab initio.* The great difficulty seems to be, if any, in determining what precisely, it is incumbent upon the plaintiff to prove, to constitute the defendant a trespasser *ab initio.* It seems to have been supposed or claimed at the trial, that the fact, of defendant having admitted in the pleas, his participation in the detention of the vessel up to the very moment of unlading, this should be assumed for all purposes, as the basis of the proof of abuse of authority by him, and also of his being present, by his agents, at the time of the demand by the plaintiff's agent, and the refusal by Dimmick to give up the vessel. We do not well see, how the plaintiff can rely upon any fact, alledged or admitted in the pleas, to make out the abuse of authority alledged in the replication. That must be determined by the evidence introduced for that purpose. The cases all concur in saying, that in order to prove such a replication, it is necessary for the plaintiff, to prove something more than a mere *non feasance*—a demand, and refusal to give up the property, for instance. This is the very point resolved in *The Six Carpenter's case,* and is one of the distinct propositions laid down in Mr. Smith's

learned note to that case, and by the American editor Mr. Wallace, and is supported, by almost all, if not in fact all the cases upon the subject, which are very numerous, and will be found elaborately collated in 1 Smith's Lead. Cas. 190–193. The case of *Jacobsohn* v. *Blake*, (Hilary Term, 1844, 6 Man. & Gr. 918 ; 46 Eng. C. L. Rep. 918,) is more analogous to the present, than ordinarily occurs. That was an action of trespass against custom house officers, for detaining goods under a claim that they were forfeited, and till that question should be determined by the commissioners; when it being found, that they were not forfeited, the goods were surrendered, and the duties accepted. But in the mean time, the value of the goods had depreciated in the market, by which, the plaintiff's sustained a serious loss. The court held, that the original seizure being legal, under an authority in law given such officers, for purposes of inspection, that they could not be made trespassers, short of some positive wrong, which went to show, that the original taking was not for the purpose which the law recognized, but for some other indirect and unjustifiable object. And it was said, that even were the goods shown to have been detained an unreasonable time, it would not justify an action of trespass. TINDALL, CH. J., says "Whether or not the plaintiff might have main- "tained an action in another form, if it could have been shown that "the goods were detained an unreasonable time, we are not called "upon to determine ; it is sufficient to say, that trespass under the "circumstances is not maintainable." COLTMAN, J. says, "If the "goods had been afterwards detained by them, for a time more than "reasonable for the examination, that might have been an abuse of "their authority, so as to render them liable in another form of ac- "tion." This shows very fully, the sense of the profession in Westminster Hall upon this subject, long since this suit, has been pending in court.

*Shorland* v. *Govett*, (5 B. & C. 485 ; 11 Eng. C. L. R. 279,) is a case, where the subject seems to have received very full examination, and very fully sanctions the proposition, that even for a positive wrong, no way connected, as a necessary consequence of, and giving character to, the original entry or taking, the defendant will not be regarded as a trespasser *ab initio*. This was a case where the sheriff entered the plaintiff's dwelling-house with process to levy a certain sum, and refused to leave, until a larger sum was paid him.

*Gardner* v. *Campbell*, (15 Johns. R. 401) is a case, where the
sheriff levied upon personal property in satisfaction of an execu-
tion, and after receiving the full amount of the execution, and all
charges, refused to surrender the property; and the court held that
even this, did not make him a trespasser *ab initio*, and that even
replevin, would not lie. But of the perfect soundness of this case,
one might perhaps doubt. And so far as this case decides, that
even replevin will not lie for the goods, the case is denied in *Ba-
ker* v. *Fales*, (16 Mass. R. 153) but expressly affirmed there, to be
sound, in holding that the defendant, did not become a trespasser
*ab initio* by refusal to deliver the goods. But replevin will lie for
an unlawful detention, if brought in that form. But the case of
*Gardner* v. *Campbell* was brought only in the *cepit*, and not in the
*detenit*, so that the criticism of PITMAN, J., in *Baker* v. *Fales* is
founded in a misconception of the case, and I cannot find that it
has been otherwise questioned. And it seems to have been follow-
ed in New York, in a numerous class of cases, referred to in a note
to 2d ed. of 15 Johns. R. 402, and especially in *Mills* v. *Martin*
19 Johns, R. 32, and in *Gates* v. *Lounsbury*, 20 Johns. R. 427,
where it is expressly held, that, "when an act is lawfully done, it
cannot be made unlawful, *ab initio*, unless by some positive act in-
compatible with the exercise of the legal right to do the first act."
Cases of this general character, all tending to support the same
general proposition, that one will not be made a trespasser *ab initio*,
except by doing some positive wrongful act giving character to the
original act, might be multiplied almost indefinitely. It is obvious
from the slightest examination of the English books, that this doc-
trine of making public officers trespassers *ab initio*, is very much
discountenanced of late; and upon many subjects, and among oth-
ers in distress for rent, the English statutes provide that one shall
not become such by reason of any irregularity in disposing of the
chattels distrained. In *Shorland* v. *Govett supra* LITTLEDALE says,
in regard to this whole subject, as taking its chief origin from *The
Six Carpenter's case* "whether there is much good sense in that
case, it is unnecessary to say;" *i. e.*, whether it is wise ever to have
made one a trespasser by relation. We should certainly not feel
disposed to extend the doctrine, beyond its present somewhat cir-
cumscribed limits.

Not to employ more time in discussing the precise requisites of

the law, to make one a trespasser from the beginning, it seems sufficient, for the purpose of the present case, to say that all the cases concur in declaring that some positive act of wrong is indispensable in order to constitute one's lawful act a trespass. And in the present case, after repeated careful reading of all the evidence, I have found it impossible to discover the least scintilla of evidence, tending in the remotest degree to implicate the defendant in any positive wrongful act. If it should be assumed, that he, having participated in the seizure, was bound to see to it, that the vessel or goods were regularly proceeded with, under the act of Congress, and properly taken care of in the mean time, yet the non-performance of both these duties, if it be assumed, that the law casts them upon defendant, is but a mere *non feasance*, and not sufficient according to all the cases, to make the defendant a trespasser from the beginning. The plaintiff's only remedy in such a case, for the destruction of his boat through want of ordinary care, would be perhaps, a special action of trespass on the case, but clearly not trespass. But, in regard to the necessity of any proceedings against the vessel after it was destroyed, it would seem, to one of mere common sense and apprehension, sufficiently absurd, and perhaps not to be countenanced, even by the "artificial reasoning" of the law according to my LORD COKE.

And there was certainly slight evidence, at the trial, of any want of ordinary care, even in those who had custody of the boat. They might be, and probably were, deficient in skill, but under the circumstances of an almost actual conflict, between the soldiery and citizens, in order to preserve the good faith of the nation, towards a foreign power with whom we were at peace, and when citizens, were in a state of actual armed rebellion, and the plaintiff's vessel, engaged in this resistance to the laws, and arrested in the very consummation of its contemplated violation of our national neutrality and good faith; in such a state of affairs, it would certainly savor of offensive refinement, to require of the persons having the custody of the vessels, any prescribed legal measure of nautical skill, in managing craft thus unceremoniously thrust upon them, in the attempted execution of the laws of the country. If they did as well as they knew how to do, it is all which could be required, one would suppose, since it was very far from being a volunteer service on their part, but rather thrown upon them, by the il-

legal conduct of the plaintiff and his agent. And this is a r··ˡᵒ of law, of which especially the plaintiff could not complain, sinc resistance was offered to the captain of the boat seeing to the fas. tenings if he chose, as would seem probable from the evidence upon both sides.

What effect the interference of Capt. Dimmick, and his forcible control of the boat after her unlading shall have upon the liability of his soldiery, or upon that of defendant, who for a time consented to aid in the examination and unlading of the boat, it is not needful here to discuss.

There is nothing in the proof, tending to show any conversion of the vessel even by any one, for which an action would lie, except the demand of the surrender of the boat by the plaintiff's brother, the captain of the boat, and the witness who testified. The proof of defendant's agency in any detention or negligence, in regard to the fastenings, is entirely and absolutely wanting. Mott, is not shown to have been upon the boat after the arms, &c. were unloaded, and he is shown positively not to have been present at the time of the demand, and it is proved, that the refusal was Dimmick's, acting altogether as principal, and in no sense as the constructive agent of defendant. So too, of the care and fastening of the boat, it was altogether that of Dimmick, if any one was responsible.

So that, in every view of the defendant's conduct on the state of evidence detailed in the exceptions, it seems impossible to implicate the defendant, beyond his mere agency in seizing and unloading the arms and munitions of war, which were expressly forfeited by the act of Congress, and which, of course, under the circumstances, it was made the imperious duty of the defendant, to seize and detain, and which, to have evaded at the time, would have been justly regarded, not only a dereliction of duty, (at all times disgraceful) but, in that particular emergency, a cowardly and dastardly instance of treachery and self-seeking, at the expense of his official oath and obligation, which all fair minded men would not fail to regard, as, far more disastrous than any pecuniary loss or embarrassment, which could possibly fall upon him, and much more to be deprecated by an honorable mind, than even the loss of life, in the reasonable and prudent defence of one's country or its laws. And lastly, these very munitions of war, which, in the first instance, were included in this suit, if we are not mistaken, are now abandoned by

Stoughton *v.* Mott.

the plaintiff himself, as a hopeless pursuit, thus, virtually confessing that all which the defendant is shown to have done, was done with propriety, as matter of duty and necessity. The judgment of the County Court, being founded upon a verdict against all the evidence, is reversed, and the case remanded to the County Court.

---

NOTE.—It should be borne in mind distinctly, however, that although this form of replication has been allowed, it is understood as requiring in proof something more than the ordinary presumptive evidence of a conversion of the property, from a mere demand and refusal. The proof must show, some positive appropriation of the property, to the use of the defendant, inconsistent with the original taking for a legal purpose. But in this case, so far from anything of the kind appearing, the precise contrary is shown, so far as this defendant is concerned, that he did not apply it to his own use. The most that the proof tends to show is, that this defendant acted as servant of Dimmick and Crook, in unlading the vessel of her contraband freight, which is now admitted on all hands, to have been perfectly legal, and here he stopped. They kept the vessel over night, and by mere stress of weather, and the probable want of skill in the soldiers who were left in charge, she became a wreck. In the case of *Heald* v. *Carey.* (9 Law & Equity, Rep. 429,) tried in the Common Pleas, Jan. 1852, it was held no conversion, even in defendant, although, he might have pursued a somewhat irregular course with property consigned, and been guilty of possible negligence, if he acted in good faith, notwithstanding the goods might in the mean time, have been destroyed by fire, at a place where they were deposited by defendant, for safe keeping, without any other fault on his part. This is certainly very analogous to the present, upon the point of supposed negligence. Regarding Dimmick as the servant of defendant, which, as we have said, was not strictly true even, the plain truth in regard to this case is, that upon the evidence detailed, there is not the remotest ground of charging this defendant with anything wrong in regard to the transaction. If there was anything wrong, or any responsibility, it rested upon Capt. Dimmick, as he very frankly declares in his testimony; and if made liable, there can be no doubt, the government would assume the burden, in regard to which we desire to say nothing, understanding that these questions are pending in another, and, as we think, the appropriate tribunal.